

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GAVROS SHIPPING CO. LTD.,

                      Plaintiff,

     - against -

ALLIED MARITIME INC.,

                      Defendant.
-------------------------------------------------------------------X

## VERIFIED COMPLAINT

     Plaintiff, GAVROS SHIPPING CO. LTD., (hereafter referred to as "Gavros" or "Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendant, ALLIED MARITIME INC. ("Allied" or "Defendant"), alleges, upon information and belief, as follows:

     1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the breach of maritime contract of charter. This matter also arises under the Court's federal question jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

     2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of Maltese law and was at all material times the owner of the motor vessel "SIFNOS SKY" (hereinafter the "Vessel").

     3.    Upon information and belief, Defendant Allied was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of the laws of

Liberia with a place of business in Athens, Greece and was at all material times the Charterer of the Vessel.

4.     By a charter party dated August 10, 2002, Plaintiff time chartered the Vessel to Defendant for about "2 Charterers' option, 3 laden legs via safe port(s)/berth(s)/anchorage(s), always within IW, in/out geographical rotation intention; South American grains/agricultural products and/or fishmeal and/or concentrates and/or Chilean nitrates and/or other lawful merchandise."

5.     Plaintiff delivered the Vessel into the service of the Defendant and fully performed all duties and obligations under the charter party.

6.     A dispute arose between the parties regarding Allied's failure to pay loss of earnings, outstanding hire, repair costs and related expenses due and owing to Plaintiff under the charter party contract.

7.     As a result of Allied's breach of the charter party due to its failure to pay loss of earnings, outstanding hire and repair costs, Plaintiff has sustained damages in the total principal amount of $138,673.15 exclusive of interest, arbitration costs and attorneys fees.

8.     Pursuant to the charter party, disputes between the parties are to be submitted to arbitration in London subject to English law. London arbitration proceedings were commenced by appointment of a sole arbitrator who died earlier this year. A replacement arbitrator has not yet been appointed. Attached hereto as Exhibit 1 is a copy of Plaintiff's Claim Submissions in the London arbitration.

10.     This action is brought in order to obtain jurisdiction over Allied and also to obtain security for Gavros' claims and in aid of arbitration proceedings.

2

11. Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party. As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| | | | |
|---|---|---|---|
| A. | Principal claim – | Loss of Earnings | $ 68,200.00 |
| | | Outstanding Hire | $ 37,436.00 |
| | | Repair Costs | $ 33,037.15 |
| | | Total Principal | $138,673.15 |
| B. | Estimated interest on claim – 3 years at 7.5% compounded quarterly: | | $ 34,593.68 |
| C. | Estimated arbitration costs: | | $ 10,000.00 |
| D. | Estimated attorneys' fees and expenses: | | $ 100,000.00. |
| **Total:** | | | **$283,266.83.** |

12. The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

13. The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the

Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claim as described above.

**WHEREFORE,** Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $283,266.83 belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

D.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

4

E.    That this Court recognize and confirm any arbitration award(s) or judgment(s)

rendered on the claims set forth herein as a Judgment of this Court;

F.    That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

G.    That the Plaintiff has such other, further and different relief as the Court

may deem just and proper.

Dated:        December 20 2007
              Southport, CT

                              The Plaintiff,
                              GAVROS SHIPPING CO. LTD.

                              By: _____
                                  Charles Murphy
                                  Patrick F. Lennon
                                  LENNON, MURPHY & LENNON, LLC
                                  420 Lexington Avenue, Suite 300
                                  New York, NY 10170
                                  (212) 490-6050 - phone
                                  (212) 490-6070 – facsimile
                                  cem@lenmur.com
                                  pfl@lenmur.com

## ATTORNEY'S VERIFICATION

State of Connecticut  )
                   )    ss.:   Town of Southport
County of Fairfield  )

1.    My name is Charles E. Murphy.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am a partner in the firm of Lennon, Murphy & Lennon, LLC attorneys for the

Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    December 20, 2007
          Southport, CT

                                  Charles E. Murphy

6

**EXHIBIT 1**

259966



# MAYS BROWN
S O L I C I T O R S

18b Ensign Street, London E1 8JD
Tel :        +44 (0) 20 7264 0600
Fax :       +44 (0) 20 7264 0601
eMail :    nvdr@maysbrown.com

William Packard
20 Victory Road
West Mersea
Colchester
Essex
CO5 8LX

Your Ref :
Our Ref :    NVDR/SWC/021
Date :       16 June 2005

Dear Sir,

## M/V SIFNOS SKY - C/P dd 10.08.02

Please accept this letter as Claimants' Claim Submissions.

1. By a time charterparty on an amended NYPE 1946 Form dated 10th August 2002, ("the Charterparty") the Claimants/Owners, Gavros Shipping Company Ltd. of Malta ("the Owners") let the M/V "SIFNOS SKY" to the Respondents/Charterers, Allied Maritime Inc. of Monrovia ("the Charterers") for about "2 *Charterers' option, 3 laden legs via safe port(s)/berth(s)/anchorage(s), always within IWL, in/out geographical rotation intention; South America grains/agricultural products and/or fishmeal and/or concentrate and/or petroleum nitrates and/or other lawful merchandise.*" The vessel was delivered to Charterers on 13th August 2003 at 03:01 hours.

2. The terms of the Charterparty included the following:

### Clause 4

"...*that the Charterers shall pay for the use and hire of the said vessel at the rate of US$5,600, daily including overtime, ...re-delivery in like good order and condition, ordinary wear and tear excepted...*"

- 2 -

Clause 6

*"...that the cargo or cargoes be laden and/or discharge in any safe dock or at any safe wharf or safe place that Charterers or their agents may direct, "*

Clause 8

*"...and Charterers are to load, stow, trim, secure, dunnage, unlash and discharge... the cargo at their expense under the supervision and direction of the Captain, "*

Clause 22

*"Owners shall maintain the gear of the ship as fitted, provided gear (for all cranes) capable of handling lifts as per description clause. "*

Clause 29 -Vessel's description

*"5 x 25 ts cranes -- not allowed the use of more than one crane per hold/hatch,"*

Clause 29(11)

*"location of cranes: one crane in aft of each hold (5 total) outreach: 7,50m"*

Clause 29(26)(H)

*"Owners warrant that the vessel's gear is well maintained and in good working order, serving all hatches... "*

Clause 50

*"The stevedores although appointed and paid for by the Charterers, Shippers or Receivers or their agents to be regarded for all purposes as servants of the Owners and to remain under the control and direction of the Master, who is entitled to direct and shall give instructions to the stevedores for the proper*

- 3 -

*loading/stowing/discharging of the cargo and the safe keeping/seaworthiness of his vessel.*

*Charterers not to be held responsible for any damage of the vessel incurred during the loading and discharging operations unless the Master advises Charterers of such damage by telex or fax as soon as apparent but not later than vessel's sailing the port where the damage occurred.*

*Master also to give notice to both Charterers' agents and the party causing damage within a maximum of 24 hours and in any case before leaving port and to use at his best endeavours to obtain admission of liability of the party causing damage and have the damage repaired by this party.*

*Copies of the correspondence together with the original letter acknowledging liability, if obtained, to be sent to Charterers as soon as possible, but in any event within 30 days of the damage occurring. Should damage affect the seaworthiness or commercial operation of the vessel, then the damage to be repaired at Charterers' risk and expense and prior to redelivery and vessel remaining on-hire without interruption. Provided Owners and/or the Master comply with the requirements in this clause, Charterers will remain ultimately responsible for any damage caused."*

3.  Pursuant to the Charterparty on or about 16th February 2003, 09:15 hours at Port Harcourt, Nigeria during discharge operations from hold no. 2 with the vessel's no.1 crane, the said crane's boom/jib fell downwards on to a portside cargo ventilation duct and was extensively damaged. The cargo that was being discharged fell in between two articulated trucks parked on the quayside, parallel to the vessel.

4.  The Charterers are responsible for the discharge of the cargo and discharge was to take place at their risk and expense.

5.  The vessel's cranes were properly maintained, at all times in good working order and capable of handling lifts as stipulated under the Charterparty.

6.  Owners and/or the Master notified the Charterers and their Agents of the crane damage in accordance with clause 50. See Exhibit A.

- 4 -

7.    Under clause 50 of the Charterparty Charterers" *remain ultimately responsible for any damage caused*".

8.    Alternatively, in breach of clause 6 and/or clause 8 and/or an implied term of the Charterparty the breakdown/damage of the crane and consequent damages/losses were caused by the reckless and/or negligent handling and/or operation of the crane by Charterers and/or the Stevedore Crane Operator and/or through the reckless and/or negligent cargo handling and/or operation and/or discharge by the Charterers and/or Stevedores. See the OC Marine Survey report attached at Exhibit B.

Particulars:

(i)    The quay where discharge took place was not long enough to properly accommodate the entire length of the vessel. Therefore, instead of the vessel lying parallel to the quayside, the vessel's stern was close alongside whilst the bow was at an angle away from the quayside resulting in a gap of about 3 to 4 metres between the bow shipside and the quay. See illustration at page x of OC Marine Report at Exhibit C.

(ii)    On 16th February 2003 cargo operations recommenced at 07:30 hours. Articulated trucks were drawn up on the quayside in two rows parallel to the vessel. The vessel's cranes, including crane no. 1, were used to discharge/transfer slings of bagged rice from the holds to these trucks. At around 09:15 hours whilst transferring a sling load of bagged rice from hold no. 2 to the trucks the crane's jib suddenly dropped below the normal working level, fell on to the upright ventilation duct located near the forward port corner of hatch number 2 and was damaged.

(iii)    Approximately 100 bags could be moved in each sling. The average bag weighed about 40 kg. The weight of each sling was therefore in the region of 4 mt which is far less than the crane's 25 mt safe working load.

- 5 -

(iv)     The inner truck was positioned approximately 1.5 metres from the edge of the quay, each truck had an approximate width of 3 meters and the distance between the inner and outer trucks was approximately of 1.5 meters. In addition, there was a gap between the shipside and the quay of approximately 3 to 4 meters. Therefore the distance to the centre of the outer truck, measured along the line of the jib from the centre of the crane base, was approximately 24 metres (12.5m (centre of crane to ship rail) + 4m (ship side to quay side) + 1.5m (quay side to inner truck) + 3m (width of inner truck) + 1.5m (distance between trucks) + 1.5m (to centre of outer truck) = 24m). However, when the jib is lowered to its normal minimum angle of 30 degrees to the horizontal, the reach is only 20 metres (7.5 meter outward reach from the shipside) and it would only have been able to reach the nearer truck and not outer truck. See sketch attached to Master's Statement at Exhibit C.

(v)     In order to swing the load on to the outer truck the stevedores on the quayside manually push/pulled and/or manipulated the load back and forth to create a pendulum motion. It was whilst the stevedores were attempting to swing/place a sling load of bagged rice on an outer truck that the jib fell down and the load fell in between the two trucks. See Master's statement attached at Exhibit C.

(vi)     When the load was swung below the jib, forces in excess of the safe working load were exerted on the jib and luffing wires. These additional forces almost doubled the static load arising from the sling load. The luffing winch motor's brake is designed to absorb the forces normally expected, however, with the increased stresses/forces the brake slipped causing the jib to lower uncontrollably and crash onto the port ventilation duct damaging the crane. Owners will lead expert evidence in this regard.

9.     By reason of the aforesaid breaches of the Charterparty, the Owners have suffered loss and damage.

## PARTICULARS:

(i)     The Owners suffered loss of earnings in the sum of US$ 68,200.00.

- 6 -

### Particulars:

The Charterers redelivered the vessel on 4th March 2003, following which Owners, by a time charter party dated 10th March 2003, let the vessel to Bunge Global Markets S.p.A. of Rome ("the Bunge fixture") for one charter trip with bulk grain at a rate of US$ 4,500.00 per day. The vessel was delivered "*on dropping outward last sea pilot Port Harcourt on 4th March 2004, 08:00 hours Retroactive*" See copy of Charterparty attached at Exhibit D.

Due to the inoperability of the vessel's crane access to holds nos. 1 and 2 were restricted and for this reason Bunge Global Markets S.p.A. were able to negotiate a rate of US$ 4,500.00 per day. At the time of the Bunge fixture the market had risen and if the vessel had been in a fully efficient state and in every way fitted for service a rate of more than US$ 5,600.00 would have been attainable.

The loss of earnings is calculated over a 62-day period from 4th March 2003 to the date of redelivery 5th May 2004, and is the difference between the Charterparty and Bunge fixture hire rates over 62 days.

(ii)    Outstanding hire in the sum of US$ 37,436.00

### Particulars:

7 days hire at US$ 5600 less 4.5% commission

(ii)    Repair costs of the vessel' crane and related expenses in the sum of US$ 33,037.15. There were no repair facilities at Port Harcourt and vessel's Classification Society and the Crane Manufacturers recommended that repairs take place at a European port. A bundle of supporting documents is attached at Exhibit E.

- 7 -

Particulars:

| | |
|---|---|
| Repairs of crane | US$ 4470.00; |
| Wharfage under repairs | US$ 1509.00; |
| Class expenses | US$ 1742.00; |
| Costs of technical supervision/attendances | US$ 3121.95; |
| Spare parts from manufacturer | US$ 10125.00; |
| Manufacturer specialist attendance | US$ 7504.00; |
| Manufacturer specialist hotel | US$ 310.30; |
| Constanza Agents expenses | US$ 4254.90. |

10.  The Charterers seek an award of the sum of US$ 138,673.15, plus costs and interest pursuant to clause 49 of the Arbitration Act of 1996.

Yours faithfully,

**Mays Brown Solicitors**

CC:
Ian Hawkes
More Fisher Brown
1 Norton Folgate
London W1 6DB